HOME SHOPPING CLUB, INC.,
Plaintiff–Appellee,

v.

ROBERTS BROADCASTING COMPANY OF DENVER, Licensee of Television Station KTVJ, Channel 14, Boulder, Colorado, Defendant–Appellant.

No. 96CA1960.

Colorado Court of Appeals,
Div. V.

April 30, 1998.

Rehearing Denied July 9, 1998.

Hogan & Hartson L.L.P., John W. Cook, Kathryn W. Bradley, Jeffrey S. George, Colorado Springs, for Plaintiff–Appellee.

Bookhardt & O'Toole, P.C., Dawn P. Bookhardt, Kevin J. O'Toole, Wendy H. Bird, Denver, for Defendant–Appellant.

Opinion by Judge MARQUEZ.

Defendant, Roberts Broadcasting Company (Roberts), appeals a preliminary injunction granted to plaintiff, Home Shopping Club, Inc. (HSC), prohibiting Roberts from preempting any portion of HSC's programming during the remainder of the contract. The written order enjoins Roberts through February 22, 2003, from preempting the broadcast of HSC for any infomercials, commercials, and/or programs or program segments which are advertisements for commercial products. We affirm.

Roberts owns a television station in the Denver/Boulder metropolitan area. It currently operates as a permittee because its license is pending before the Federal Communications Commission (F.C.C.). HSC operates an electronic retail business that is distributed by satellite, cable, or broadcast station.

On September 23, 1994, the parties entered into an ʻaffiliation agreement which in part requires Roberts to broadcast HSC's

programming for a period of seven years. In pertinent part the agreement provides:

> [Roberts] has determined that the public interest, convenience, and necessity would be served by its broadcast of the HSC PROGRAM SERVICE.
>
> HSC agrees to make available to [Roberts]... a minimum of five (5) minutes in each hour of the [HSC] broadcast by [Roberts] for use by [Roberts] for local programming or commercials, which number of minutes can only be amended by mutual agreement of HSC and [Roberts] from time to time.
>
> Nothing herein contained shall be construed to prevent or hinder [Roberts] from rejecting or refusing such portions of the HSC PROGRAM SERVICE which [Roberts] reasonably believes to be unsatisfactory or unsuitable or contrary to the public interest or substituting a program which in [Roberts'] opinion is of greater local or national importance. [Roberts] shall provide HSC with prompt telegraphic notification of any such refusal, rejection or substitution.

Schedule A of the agreement provides that Roberts is to broadcast HSC programming a minimum of 164 hours per week. The schedule is 24 hours a day Monday through Saturday, and 12:00 a.m. to 6:00 a.m. and 10:00 a.m. to 11:59 p.m. on Sunday. It also provides: "Should [Roberts] preempt any portion of HSC program schedule on an ongoing basis, HSC shall have the right, notwithstanding anything contrary in this agreement, to evaluate its financial relationship with [Roberts] and adjust [Roberts'] hourly compensation accordingly, effective immediately upon written notice to [Roberts]."

Under schedule B of the agreement, Roberts is to be compensated $151 per hour for each hour of HSC programming that it broadcasts. Schedule B also provides that compensation may not be reduced below $141 per hour except for certain stated reasons, including Roberts' preemption of HSC programming as set forth in Schedule A.

Prior to the commencement of Roberts' broadcast, HSC made arrangements with certain of its other affiliates to reduce the five-minute or seven-minute break during each hour to two minutes in exchange for a three-hour block of programming returned to the affiliates. Roberts informed HSC that it did not want to reduce the five-minute break and would consider any such reduction to constitute a breach of the contract. HSC then informed Roberts that it agreed that any change of the five-minute break format required mutual consent of the parties and that Roberts would be able to maintain its current format.

Alleging that beginning on April 27, 1996, Roberts breached the affiliation agreement when it preempted HSC's programming to air in its place other paid programming (infomercials), HSC filed a complaint for injunctive relief and a motion for preliminary injunction. After a three-day hearing during which both sides presented evidence, the court granted HSC's motion. It is from that order that Roberts appeals.

## I.

Roberts contends that in granting the preliminary injunction the court misinterpreted the agreement between the parties. We disagree.

■ The granting or denial of a preliminary injunction lies within the sound discretion of the trial court. *Rathke v. MacFarlane*, 648 P.2d 648 (Colo.1982).

■ In exercising its discretion, the trial court must find that the moving party has demonstrated: (1) that there is a reasonable probability of success on the merits; (2) that a danger of real, immediate, and irreparable injury exists which may be prevented by injunctive relief; (3) that there is no plain, speedy, and adequate remedy at law; (4) that the granting of the preliminary injunction will not disserve the public interest; (5) that the balance of equities favors the injunction; and (6) that the injunction will preserve the status quo pending a trial on the merits. If any criterion is not met, injunctive relief should not be granted. *Board of County Commissioners v. Fixed Base Operators, Inc.*, 939 P.2d 464 (Colo.App.1997).

■ We review a ruling on a motion for preliminary injunction with deference to the conclusion reached by the trial court and will not overturn a trial court's ruling unless it is manifestly unreasonable, arbitrary, or unfair. However, if the issue being reviewed concerns only legal, rather than factual, questions, a preliminary injunction ruling is subject to independent *de novo* appellate review. *Evans v. Romer*, 854 P.2d 1270 (Colo.1993).

■ The interpretation of a contract is a question of law. *Dikeou v. Dikeou*, 916 P.2d 601 (Colo.App.1995). In order to determine the intent of a contract, it must be construed as a whole and effect must be given to every provision, if possible. *Holland v. Board of County Commissioners*, 883 P.2d 500 (Colo. App.1994).

### A.

Roberts argues that because the affiliation agreement explicitly provides for preemption of HSC programming, the trial court abused its discretion in determining that HSC demonstrated a reasonable probability of success on the merits. We do not agree.

■ In assessing the likelihood of success on the merits, the court should not treat this factor as one that is merely considered and balanced with the comparative injuries of the parties. *Rathke v. MacFarlane, supra.*

■ The agreement here permits Roberts to substitute other programming for HSC programming that Roberts reasonably believes to be unsatisfactory, unsuitable, or contrary to the public interest. Also, the agreement gives Roberts the right to substitute a program which in its opinion is of greater local or national importance. However, the contract also provides that Roberts has determined that the public interest is served by its broadcast of HSC programming. Further, Roberts has conceded both in its brief on appeal and in oral argument that its determination whether a substituted program is of greater local or national importance must be made reasonably and in good faith. In our view, Roberts' opinion must be considered in the context of the entire contract.

Here, the trial court found that a valid contract existed, that HSC's proposed change from a five-minute to a two-minute break was not mandatory, and that Roberts was able to maintain its five-minute break format as set forth in the agreement. The trial court thus concluded that HSC had not breached the contract. Accordingly, *Home Shopping Club, Inc. v. Miller Broadcasting, Inc.*, No. 96–2229–GTV (D.Kan.1996), upon which Roberts relies, is inapplicable.

HSC presented evidence that only three of the 27 substituted infomercials were from local merchants and that Roberts received more compensation for the infomercials than it received under the contract. Roberts does not deny that it can make more money per hour for its preemption with local advertising, but argues that profit was not its sole or primary aim. The record also indicates that HSC paid Roberts the amount owed under the contract even during the time that its programming was preempted.

As to Roberts' claim that preemption was explicitly provided for in the agreement, the trial court held that, since the majority of the infomercials were not from local merchants, the ones which preempted HSC programming were not of greater local importance. The court also stated that, while HSC's programming originated from outside of the state, it is of local importance to some people of the state. It noted that if Roberts could simply preempt HSC programming in order to improve the position of local merchants, the contract would not have any validity. The court also found that Roberts' efforts do not focus explicitly on local businesses to the exclusion of others. Finally, it concluded that "this type of advertising is not what the right of refusal intends."

Thus, construing all the provisions of the contract, we conclude that the court did not err in its interpretation.

We have found no evidence to support Roberts' assertion that the infomercials it chose to air in the place of HSC programming were of greater local or national importance. Accordingly, we conclude that the trial court did not err in finding that HSC had demonstrated a reasonable probability of success on the merits.

## B.

■ Roberts next argues that because the agreement provides for specific remedies in the event of preemption, the trial court erred in holding that there was a real danger of immediate and irreparable injury and that there was no adequate remedy at law. We do not agree.

■ Equity will not act if there is a plain, adequate, and speedy remedy at law. *In Re Estate of Kubby,* 929 P.2d 55 (Colo.App. 1996).

Here, the court stated that the contract did specify what would be considered an injury to HSC. However, because this was HSC's first major effort at distribution in the local market, the court believed there existed a danger of immediate and irreparable harm to HSC. We find no error.

Roberts began broadcasting HSC programming on February 22, 1996, but started preempting that programming two months later on April 27, 1996. In this short period, HSC had not yet established its place in the market. Thus, the court could not look at previous sales by HSC over a similar period.

Roberts argues that the provisions of Schedule A of the agreement afford an adequate remedy. Specifically, it points to the provisions stating that if Roberts preempts any portion of its programming, HSC has the right to adjust the hourly compensation due to Roberts. We reject this argument.

■ Where claims for damages are premised on breaches of contracts, "damages that are merely speculative, remote, imaginary, or impossible of ascertainment, cannot be recovered." *Colorado National Bank v. Friedman,* 846 P.2d 159, 174 (Colo.1993). Here, most of the preempted programming aired during prime time. Because of HSC's recent entry into the Denver/Boulder market, any attempt to calculate the value of that time might be speculative.

As such, we conclude that the trial court did not err in holding that there was an immediate danger of irreparable harm and that there existed no adequate remedy at law.

## C.

■ Contending that the preliminary injunction modifies the agreement and prevents it from fulfilling its public-interest obligation, Roberts argues that the injunction disserves the public interest. We do not agree.

Roberts points to 47 C.F.R. § 73–658(e)(1997), which requires that the licensee retain control over the programming. It also relies on *National Broadcasting Co. v. U.S.,* 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943) in arguing that by entering the injunction, the court created an exclusive arrangement which prevents Roberts from giving the public the best service available. We disagree.

*National Broadcasting* involved the networks' refusal to allow its affiliates to air the 1939 World Series being broadcast by a rival network. The F.C.C. described this program as one "of outstanding national interest to stations throughout the country...." *National Broadcasting Co. v. U.S., supra,* 319 U.S. at 199, 63 S.Ct. at 1002, 87 L.Ed. at 1353. The Supreme Court concluded that a licensee station does not operate in the public interest when it enters into exclusive arrangements which prevent it from giving the public the best service available. However, the Court in *National Broadcasting* was addressing a very different fact situation, and that case does not provide a justification for the type of preemption attempted by Roberts.

Here, the trial court stated that the business community must be able to rely on its contractual arrangements and agreements. As set forth above, the affiliation agreement specifically provides that Roberts has determined that the public interest is served by its broadcast of HSC programming. The court found there was no discussion about the local merchants' need for access. Additionally, only three of the 27 infomercials broadcast in place of HSC programming were from local merchants.

The court's findings are adequately supported by the record. Accordingly, the court did not err in finding that the granting of the

injunction would not disserve the public interest.

### D.

 Roberts further asserts that the trial court erred in holding that the balance of equities favors an injunction. We do not agree.

In granting the injunction, the court reasoned that equity would not be served by allowing Roberts to breach a seven-year contract at such an early juncture. The court reiterated its finding that HSC had not breached the agreement with respect to the five-minute break format since Roberts was still able to take that break. Finally, the court stated that certain things can be legal and appropriate preemptions, "and these infomercials are not."

Insofar as Roberts asserts that equity favors protection of its First Amendment rights against prior restraint and censorship, the trial court rejected such assertions. The trial court reasoned that the contract limited Roberts' rights. Further, the court also stated that it did not intend that there be no preemption whatsoever.

The evidence supports the court's finding that the balancing of the equities supports granting an injunction.

### E.

Further, Roberts contends that because both the F.C.C. regulations and the contract give it the right to reject programming, the preliminary injunction does not preserve the status quo. We disagree.

The purpose of an injunction is to preserve the status quo, *Combined Communications Corp. v. City & County of Denver*, 186 Colo. 443, 528 P.2d 249 (1974), and the trial court recognized, with record support, that the status quo was the contract.

Accordingly, it did not err in granting the injunction.

### II.

Roberts' final contention is that the preliminary injunction does not define with sufficient specificity the conduct sought to be enjoined and that it renders meaningless the right to reject programming rule. We disagree.

C.R.C.P. 65(d) provides, in pertinent part:

> Every order granting an injunction ... shall be specific in terms; shall describe in reasonable detail ... the act or acts sought to be restrained....

An injunction prohibiting conduct must be sufficiently precise to enable the party subject to the equitable decree to conform its conduct to the requirements thereof. *Colorado Springs Board of Realtors, Inc. v. State*, 780 P.2d 494 (Colo.1989).

HSC concedes on appeal that the injunction is limited to programming consisting in whole or substantial part of advertisements for commercial products. Such is sufficient to define the conduct enjoined.

The judgment is affirmed.

KAPELKE and KIRSHBAUM*, JJ., concur.