25CA0841 Leben v Lowe 05-21-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 25CA0841
Montrose County District Court No. 23CV30010
Honorable D. Cory Jackson, Judge

Bruce Leben and Theresa Leben, individually and as trustees of the Bruce L. Leben and Theresa A. Leben Trust,

Plaintiffs-Appellants,

v.

Jerry Lowe and Andrea Lowe,

Defendants-Appellees.

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division IV
Opinion by JUDGE SCHUTZ
Freyre and Brown, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced May 21, 2026

Brian Kidnay, P.C., Brian Kidnay, Montrose, Colorado for Plaintiffs-Appellants

Dufford Waldeck, William S. DeFord, Grand Junction, Colorado, for Defendants-Appellees

¶ 1   This appeal arises out of the latest lawsuit involving plaintiffs, Bruce and Theresa A. Leben (the Lebens), and their neighbors, defendants, Jerry and Andrea Lowe (the Lowes).  The Lebens made several claims against the Lowes — including trespass, negligence per se, a private right of action for leaving a gate open, and nuisance — and requested a permanent injunction.

¶ 2   The court held a bench trial, after which it rendered its findings of fact and conclusions of law and entered judgment primarily in favor of the Lowes.  The Lebens appeal several portions of the trial court's judgment.  We affirm the judgment in part, reverse the judgment in part, and remand to the trial court for further proceedings consistent with this opinion.

I.   Background

¶ 3   The properties in question have a complex and entangled history.  Initially, the two ranches were part of a single property owned by Kinikin Partnership (Kinikin).  Roger Prock, the owner of Kinikin, interacted extensively with the parties during and after their purchases of the properties, and he still resides nearby.  In 2001, Ivan and Sheila Kelso (the Kelsos) bought a little less than half of the property from Kinikin.  Kinikin sold the remaining parcel

of land to the Lebens in 2006 (the Leben ranch). The Kelsos sold their parcel to the Lowes in 2016 (the Lowe ranch). The ranches are adjacent to each other, and Q72 Road — a public road — runs through and next to both properties at different points.

¶ 4 This dispute primarily relates to two easements. The first is an access easement from Q72 Road to the Lowe ranch and the Leben ranch. Prock initially created the access easement in 2001 when he sold the Lowe ranch parcel to the Kelsos so that he could still access the Leben ranch parcel from Q72 Road. The access easement begins at Q72 Road and runs largely north and then diagonally northeast.

¶ 5 Where the access easement intersects with the Leben ranch, it is extended by a second easement known as the Dry Cedar Creek easement. The Dry Cedar Creek easement acts, in part, as a boundary between the two properties. Both easements are thirty feet wide. Fifteen feet of the Dry Cedar Creek easement's width lies on each ranch. The Lebens constructed a fence in the vicinity of the southern boundary of the Dry Cedar Creek easement.

¶ 6 The Kelsos used the Dry Cedar Creek easement infrequently when they owned the Lowe ranch parcel. The Dry Cedar Creek

easement was largely overgrown and difficult to traverse, especially during the winter months. The trial court determined that the Dry Cedar Creek easement was "not intended for any specific, limited purpose."

¶ 7 Prior to selling the Leben ranch in 2006, Prock built a large archway across the access easement just east of where it meets the Dry Cedar Creek easement to make the property more attractive to prospective buyers. In 2009, the Lebens rebuilt the archway. In 2011, the Kelsos sued the Lebens, alleging the new archway trespassed on their property. The Kelsos also alleged that the Lebens had installed a large sign with their surname in the archway, which crossed the access easement on the Lowe ranch. The Kelsos and the Lebens settled their disputes, agreeing to informal terms in June of 2011 (June agreement) and formalizing the agreement the following month (July agreement). One of the terms of the July agreement required "[a]dherence by all parties to the terms and conditions of the [June agreement]."

¶ 8 As part of the July agreement, the parties agreed that the archway with its gateposts could remain on the Lowe ranch. Importantly, no gate had ever been placed across the access

easement at the archway, and the Lebens did not negotiate for a gate as part of either the June agreement or the July agreement.

¶ 9 The June agreement also required the Lebens to execute a bill of sale to the Kelsos for a water pipe and a divider box to which the pipe connected. The Kelsos paid the Lebens $4,000, and the June agreement reflected that "[t]he divide[r] box and ditch which feeds it will belong equally to both parties and be jointly maintained."

¶ 10 In a prior suit in 2017, the Lowes sued the Lebens, asserting claims for declaratory judgment, trespass, and invasion of privacy. As part of the 2017 action, the Lowes sought the ability to build a gate across the access easement near Q72 Road to exclude trespassers and prevent livestock from wandering onto the Lowe ranch. Following a bench trial in September 2018, the court entered findings of fact and conclusions of law (2019 order), finding that it could not "conclude that a gate on the [access] easement [was] permitted" but that the Lowes could install a cattle guard at the beginning of the access easement instead. The trial court concluded that any cattle guard would only be permitted "so long as such cattle guard d[id] not in any way interfere with the use of the easement by the Lebens." In early 2023, the Lowes installed a

4

cattle guard that traverses the full thirty-foot width of the access easement where the easement begins at Q72 Road.

¶ 11     Shortly before the Lowes installed the cattle guard, the Lebens installed a gate across the access easement at the archway on the Lowe ranch. The Lebens placed a lock on the gate and provided the Lowes with the combination. Simultaneously, the Lebens dug a bar ditch on the Lowe ranch to help the access easement drain adequately to protect both the easement and the archway. The Lebens lined the bar ditch with riprap (a general term for fractured rock and concrete used to stabilize soil) to ensure the ditch drained sufficiently.

¶ 12     Given these disputes, the Lebens brought the current suit against the Lowes in late January 2023. The court set the matter for a hearing on the Lebens' request for a preliminary injunction. At the completion of the hearing, the court declined to enter a preliminary injunction.

¶ 13     Prior to trial, the Lowes raised a counterclaim for trespass against the Lebens based on the location of the fence near the Dry Cedar Creek easement. The court set a three-day bench trial, beginning in September 2024.

¶ 14    During the litigation, to circumvent the Lebens' locked gate, the Lowes built a bypass from the access easement starting about twenty-five feet west of the gate, across the Lowe Ranch, and back to the Dry Cedar Creek easement about twenty-five feet east of the gate (the bypass).  In the process of building the bypass, the Lowes removed a portion of the rip rap from the bar ditch and replaced it with a culvert.  At some point, the Lowes also locked half of the divider box.  The Lebens amended their complaint to address the bypass and changes to the bar ditch.

¶ 15    Following a bench trial, the trial court issued its findings of fact and conclusions of law.  The court determined that the cattle guard that the Lowes installed was reasonably designed and complied with the 2019 order.  The trial court also determined that the parties jointly owned the divider box, that the Lebens' new gate at the archway was an impermissible burden on the Dry Cedar Creek easement, and that the bypass existed solely on the Lowe ranch and therefore did not interfere with the Leben ranch or the Dry Cedar Creek easement.  Finally, the trial court determined that the Lebens' fence trespassed on the Lowe ranch and issued an injunction requiring the Lebens to move the fence.

¶ 16    The Lebens now appeal.

## II.    Standards of Review and Applicable Law

¶ 17    We review the trial court's factual findings for clear error and its legal conclusions de novo.  *C & C Invs., LP v. Hummel*, 2022 COA 42, ¶ 35.  Clear error exists "only if there is nothing in the record to support" the finding.  *Loveland Essential Grp., LLC v. Grommon Farms, Inc.*, 251 P.3d 1109, 1117 (Colo. App. 2010).

¶ 18    We begin by addressing the interests created by an easement, and the burdens and benefits associated with those interests.

¶ 19    An easement is defined as

> [a]n interest in land owned by another person, consisting in the right to use or control the land, or an area above or below it, for a specific limited purpose (such as to cross it for access to a public road).  The land benefiting from an easement is called the *dominant estate*; the land burdened by an easement is called the *servient estate*.  Unlike a lease or license, an easement may last forever, but it does not give the holder the right to possess, take from, improve, or sell the land.

Black's Law Dictionary 642-43 (12th ed. 2024).

¶ 20    The Leben ranch is the dominant estate of the access easement because the easement runs across part of the Lowe

7

ranch.  The access easement allows the Lebens to move from their ranch through the Lowe ranch to Q72 Road.

¶ 21     The Dry Cedar Creek easement operates slightly differently. Recall that the easement is thirty feet wide with fifteen feet of that width on each property.  This means that the Lebens have the dominant estate for the fifteen feet of the easement that is on the Lowe ranch, and the Lowes have the dominant estate for the fifteen feet that is on the Leben ranch.  Therefore, the parties have equal rights to use the Dry Cedar Creek easement, but neither party has the right to "possess, take from, improve, or sell the land."  *Id.*

¶ 22     "The owner of the servient estate enjoys all the rights and benefits of proprietorship consistent with the burden of the easement; while the rights of the owner of the dominant estate are limited to those connected with use of the easement."  *Lazy Dog Ranch v. Telluray Ranch Corp.*, 965 P.2d 1229, 1234 (Colo. 1998). An easement, however, does not carry any title to the land or "dispossess the landowner."  *Id.*  "[When] an easement is non-exclusive in nature, both the holder of the easement and the owner of the land burdened by the easement have rights to use the property."  *Id.* at 1238.  Unless the easement agreement states

otherwise, "the owner of the servient estate may make any use of the burdened property that does not unreasonably interfere with the enjoyment of the easement by its owner for its intended purpose." *Id.*

## III. Analysis

¶ 23 The Lebens appeal several aspects of the trial court's judgment. The Lebens assert that the trial court erred by (1) concluding that the cattle guard reasonably complied with the terms of the 2019 order; (2) concluding that neither the easement nor the June agreement nor the July agreement permitted them to install a gate across the access easement at the archway; (3) finding that the bypass the Lowes constructed was neither a trespass nor an impermissible alteration of the access easement or the Dry Cedar Creek easement; (4) finding that the Lowes and the Lebens jointly and equally own the divider box and, therefore, that the Lowes were permitted to lock their half of the box; and (5) ordering them to move a portion of their fence that trespassed on the Lowe ranch without adequately identifying the area of encroachment.

¶ 24 We address each contention in turn.

## A. Cattle Guard

### 1. Standard of Review

¶ 25    "First, whether gates or cattle guards are an unreasonable interference to an easement holder is a question of fact.  Thus, we shall not disturb the findings of the trial court if supported by the evidence."  *Lazy Dog Ranch v. Telluray Ranch Corp.*, 923 P.2d 313, 317 (Colo. App. 1996), *rev'd on other grounds*, 965 P.2d 1229 (Colo. 1998).  Additionally, "when called on to interpret or construe a trial court's order, we do so de novo."  *Andrews v. Miller*, 2019 COA 185, ¶ 8.

### 2. Additional Facts

¶ 26    Recall that the 2019 order stated that the Lowes could install a cattle guard at the beginning of the access easement provided the "cattle guard d[id] not in any way interfere with the use of the easement by the Lebens."

¶ 27    After the 2019 order, the parties struggled to agree about the size and placement of the cattle guard.  The Lowes offered to build, further up the access easement, a sixteen-foot cattle guard with a corresponding fourteen-foot side gate to allow livestock in and out.  The Lebens informed the Lowes that any cattle guard that extended

less than "the full 30 feet in width" of the easement was not acceptable. And at trial, Bruce Leben articulated that a cattle guard that was less than the full thirty-foot width would make it difficult for semitrucks to access the Leben ranch through the access easement.

¶ 28    The Lebens also insisted that the 2019 order was clear: The cattle guard could only be installed "at the beginning of the [access easement]." The Lebens' insistence on the placement of the cattle guard prevented the Lowes from installing the cattle guard at their proposed alternative location 300 to 400 feet from where the access easement began at Q72 Road. The Lowes had proposed the second location because "people turning in off [Q72 Road] could clear [Q72 Road] before crossing [the cattle guard]." This meant that a large vehicle only needed to continue moving forward instead of turning while traversing the cattle guard, as would be required if the cattle guard was located at the start of the access easement.

¶ 29    Applying the terms of the 2019 order, the trial court found, in relevant part, as follows: "With respect to any argument that the cattleguard is an unreasonable interference with the Access Easement, that claim is not persuasive because the nature of any

11

interference was inherent and expressly addressed in the [2019 order], and that Order has preclusive effect here." Thus, the court concluded that the Lebens had failed to prove that the cattle guard's location, width, and round pipes violated the 2019 order or unreasonably interfered with the Lebens easement rights. As the trial court found, "[T]he Lebens repeatedly demanded the Lowes build a cattleguard to span the full width of the easement . . . [and] specifically demanded . . . a thirty-foot wide cattleguard, which leaves no space for a side-gate . . . ." Simply put, the Lowes built and installed the cattle guard as the Lebens demanded. Relatedly, the court concluded that the use of round pipes to form the cattle guard did not result in an unreasonable interference with the Lebens' access rights.

### 3. Analysis

¶ 30 On appeal, the Lebens contend that the trial court made three errors by finding that the cattle guard complied with the 2019 order.

¶ 31 First, they argue that the trial court erroneously found that "the nature of any interference was inherent and expressly addressed in the [2019 order]." The Lebens contend that the cattle

12

guard impermissibly limits the utility of the easement, thereby frustrating its purpose. *See Roaring Fork Club, L.P. v. St. Jude's Co.*, 36 P.3d 1229, 1236 (Colo. 2001). Next, the Lebens argue that the trial court erred by concluding that the 2019 order had "preclusive effect" in deciding whether the cattle guard's size and placement was appropriate. Finally, they argue that the 2019 order created an absurd result. These arguments are interrelated, so we address them together.

¶ 32    In *Roaring Fork*, the supreme court relied on the Restatement (Third) of Property: Servitudes to define the interplay between the dominant and servient estates in the easement context:

> Unless expressly denied by the terms of an easement, . . . the owner of the servient estate is entitled to make reasonable changes in the location or dimensions of an easement, at the servient owner's expense, to permit normal use or development of the servient estate, but only if the changes do not
>
> a) significantly lessen the utility of the easement,
>
> b) increase the burdens on the owner of the easement in its use and enjoyment, or
>
> c) frustrate the purpose for which the easement was created.

13

36 P.3d at 1236 (quoting Restatement (Third) of Prop.: Servitudes § 4.8(3) (A.L.I. 2000)).

¶ 33    The Lebens argue that the cattle guard significantly lessened the utility of the easement, thus violating the first prong of the Restatement's standard.  The Lebens' objection to the cattle guard at trial had two components: its width and the type of pipes used to construct the cattle guard.

¶ 34    The record supports the trial court's finding that the Lebens insisted on the cattle guard occupying the full thirty-foot width of the easement, thus precluding a side gate from being installed within the easement.  Moreover, Jerry Lowe testified that the Lebens rejected the Lowes' offer to install the cattle guard roughly 300 feet from the start of the easement, where a narrower cattle guard with a side gate would not impede wide turns.

¶ 35    The Lebens also complain that the cattle guard prevents semitrucks from accessing the Leben ranch to unload livestock.  Apparently, without the cattle guard across the access easement, the Lebens could unload sheep from a semitrailer before the semi turned onto the access easement.  From there, the sheep could walk through and up the easement to access the Leben ranch.  But

that is no longer possible because the sheep cannot cross the cattle guard, and there is insufficient space for a semi to turn around once it crosses the cattle guard.

¶ 36     This asserted problem results from the Lebens insistence that the cattle guard be located at the beginning of the access easement, not from any unreasonable action by the Lowes.  Moreover, the Lebens acknowledge that livestock could still be transported by using a pickup truck and trailer.  Thus, the record supports the trial court's conclusion that that the Lowes did not unreasonably interfere with the Lebens use of the access easement to transport livestock.

¶ 37     The trial court also heard testimony from Mark Covington, an experienced rancher who described other cattle guards installed in the area.  Covington testified that cattle guards typically include a side gate, usually between twelve and sixteen feet wide, plus thirty to forty feet of fencing to herd livestock toward and through the gate.  Covington also stated that twelve feet was the "minimum" width for a side gate.  Following Covington's testimony, the court personally inspected the properties, including the thirty-foot cattle guard.

¶ 38    It is undisputed that the access easement is thirty feet wide and that the cattle guard extends the full thirty-foot width of the easement, as the Lebens demanded.  Thus, no side gate could be installed without encroaching onto the Lowe ranch.  In other words, the Lebens' demands were impossible to satisfy within the bounds of the easement.[1]  The Lebens cannot now protest the consequence of the thirty-foot cattle guard that they demanded.  *See People in Interest of S.N-V.*, 300 P.3d 911, 913 (Colo. App. 2011) ("Estoppel doctrines generally bar a party from asserting a claim or right that contradicts what that party has said or done before . . . .").

¶ 39    Furthermore, we perceive no error in the trial court's determination that the impact of the thirty-foot cattle guard did not rise to the level of an unreasonable interference with the Lebens' use of the access easement for pedestrian traffic.  The Lebens contended at trial that the cattle guard now prevents them from

---

[1] We reject the argument made by the Lebens, for the first time at oral argument, that the Lowes should be required to convey to them a license to traverse the Lowe ranch outside of the access easement. The owner of a servient estate has no obligation to transfer an interest in the servient estate to accommodate a dominant estate owner's insistence on demands that cannot be accommodated within the easement.

walking down to retrieve their mail with their dogs and otherwise makes their property difficult to access for anyone not in a vehicle. However, Covington testified that small pets are able to go under the fences near a cattle guard, allowing them to avoid crossing the cattle guard altogether. He also testified that round cattle guards were common and worked adequately in light-traffic areas, with vehicles travelling under forty-five miles per hour, which was the case for the placement of the cattle guard on the access easement. Finally, Covington acknowledged that flat cattle guards were more common and that round cattle guards were harder for humans to walk across, although not impossible. The trial court found this testimony persuasive and more objective and credible than the Lebens' testimony.

¶ 40    Moreover, Jerry Lowe testified that he had modified the cattle guard to include a "12-inch flat plate across [the cattle guard] to give a surface to walk across." Jerry Lowe also stated that people were able to navigate this twelve-inch strip to walk across the cattle guard. The testimony of Covington and Jerry Lowe provides record support for the trial court's determination that cattle guard did not unreasonably interfere with pedestrian traffic.

¶ 41　Finally, we reject the Lebens' argument that the limited burdens the cattle guard placed on their use of the access easement created an absurd result or violated the requirement in the 2019 order stating that any cattle guard could not "in any way interfere with the use of the [access] easement by the Lebens." As the trial court noted, the 2019 order expressly contemplated the installation of a cattle guard at the beginning of the access easement, and the incidental interference complained of by the Lebens is inherent in the construction of a cattle guard across the entirety of the easement, as they demanded. Because the 2019 order contemplated the installation of a cattle guard, we interpret it to mean that the cattle guard could not unreasonably interfere with the Lebens' use of the access easement. *See Lazy Dog*, 965 P.2d at 1238.

¶ 42　In light of the evidence, we cannot conclude that the trial court's application of the 2019 order leads to an absurd result or that its finding that the cattle guard does not unreasonably interfere with the Lebens rights under the access easement is unsupported by the record.

18

## B. Archway Gate

¶ 43   We now turn to the gate the Lebens installed across the easement at the archway.  Recall that Prock had initially built an archway on the Lowe ranch for the benefit of the Leben ranch.  The Lebens eventually rebuilt that archway, and the archway was part of the 2011 lawsuit brought by the Kelsos against the Lebens.  In the final settlement of that case, the Lebens negotiated for the archway to remain on the Lowe ranch.  The settlement agreement did not permit the Lebens to install a gate at the archway.

¶ 44   Nonetheless, the Lebens note that the July agreement included "[a]n easement for the maintenance and repair of an existing or replacement gatepost and archway," and therefore, they argue, the easement implicitly recognized that they were entitled to construct a gate across the easement from one gatepost to the other.  We disagree.

### 1. Standard of Review

¶ 45   "The interpretation of a settlement agreement, like any contract, is a question of law that we review de novo." *Bumbal v. Smith,* 165 P.3d 844, 845 (Colo. App. 2007).  Likewise, we interpret the language of an easement de novo.  *See Gold Hill Dev. Co. v. TSG*

19

*Ski & Golf, LLC*, 2015 COA 177, ¶ 43. As previously noted, we review a trial court's factual findings for clear error; a finding is clearly erroneous only if there is no record support for it. *Loveland*, 251 P.3d at 1117.

## 2. Analysis

¶ 46 In the trial court, the Lebens acknowledged that the language of the July agreement and resulting easement deed are clear — granting them an "easement for the maintenance and repair of an existing or replacement gatepost and archway which spans the [Lebens'] driveway as it crosses [the Lowe ranch]." The Lebens appear to argue that because they possess the dominant estate they are entitled to a "superior right" that encompasses the right to place a gate between the gateposts. This is not the case. As the dominant estate, the Lebens are entitled to use the access easement for its stated purpose, and the Lowes are unable to unreasonably hinder that use. Neither the settlement agreement nor the easement contemplates the existence of a gate at the archway. Indeed, as the trial court found, the Lebens acknowledged "that the express language of the deed allows only for a gatepost."

¶ 47    Moreover, "[l]ocked gates are usually considered an unreasonable burden, even if the easement holder is provided with keys." *Lazy Dog*, 923 P.2d at 317. As previously noted, the Dry Cedar Creek easement is not exclusively for the Lebens' benefit; the Lowes retain the right to use the easement as well. And the trial court found the Lebens' testimony that the presence of a gate did not impose an unreasonable burden on the Lowes' rights to ingress and egress was not credible, particularly in view of the fact that the Lebens had argued in the 2017 litigation that the Lowes should not be allowed to place an automatic gate across the access easement where it meets Q72 Road.

¶ 48    The Lebens also argue that the trial court incorrectly treated the Leben ranch as the servient property and therefore applied the incorrect standard when evaluating the Lebens' ability to install a locked gate across the archway. But the court's rejection of the right to construct a gate was not premised on whether the Lebens or the Lowes were the holders of the dominant estate with respect to the Dry Cedar Creek easement. Rather, its ruling was based on the fact that the construction of a gate was not authorized by the settlement agreement and resulting deed and that such a gate

would unreasonably burden the Lowes' rights to ingress and egress across the Dry Cedar Creek easement. We perceive no error in the trial court's determination that the Lebens were prohibited from placing a gate across the access easement.

## C. Bypass

¶ 49 Next, the Lebens argue that the trial court erred by rejecting their claim that the Lowes trespassed on, and unreasonably interfered with, the Dry Cedar Creek easement when the Lowes built the bypass to circumvent the Lebens' locked gate at the archway. In building the bypass, Jerry Lowe also removed riprap from the bar ditch and replaced it with a culvert to maintain adequate drainage. We discern no error in the trial court's ruling.

### 1. Standard of Review

¶ 50 This issue involves no disputed facts. "When, as here, the operative facts are undisputed and the issue is one of law, we review de novo." *Green Tree Servicing, LLC v. U.S. Bank Nat'l Ass'n, N.D.*, 192 P.3d 1014, 1017 (Colo. App. 2007).

### 2. Analysis

¶ 51 It is undisputed that the access easement sits on the Lowe ranch and that the Lebens have the ability to use that easement to

access Q72 Road. The Lowes may do as they please with their property, provided that they do not interfere with the Lebens' reasonable use of the access easement. *See Lazy Dog*, 923 P.2d at 316 ("[T]he owner of land burdened by an easement has a qualified right to put his or her property to any lawful use for which it may be adapted.").

¶ 52 The Lowes built the bypass on their own property and, in doing so, changed the drainage method for a portion of the bar ditch. There was no testimony or other evidence that the bypass unreasonably interfered with the Lebens' use of the access easement or the Dry Cedar Creek easement or that replacing the rip rap with the culvert adversely impacted the bar ditch's ability to properly drain.

¶ 53 We perceive no error in the trial court's determination that the bypass was neither a trespass on the Leben ranch nor unreasonably interfered with the Lebens' use of the access easement or the Dry Cedar Creek easement.

### D. Divider Box

¶ 54 The Lebens also contend the trial court erred by finding that Jerry Lowe did not unreasonably interfere with the divider box

when he locked the half of the box used to irrigate the Lowe ranch. We disagree.

### 1. Standard of Review

¶ 55 The divider box involves the interpretation of the settlement agreement, which we review de novo. *See Bumbal,* 165 P.3d 845.

### 2. Analysis

¶ 56 The divider box was installed as part of the July agreement, which incorporated the June agreement by reference. Under those agreements, the Lowes' predecessors — the Kelsos — paid the Lebens $4,000 for the water pipeline that connected to the divider box and the use of half the divider box. The June agreement specifically stated that the "divide[r] box and ditch . . . will belong equally to both parties and be jointly maintained."[2] The Lowes succeeded to joint ownership of the divider box when they purchased the Lowe ranch.

---

[2] The Lebens note that the June agreement was not admitted into evidence during the trial. But the July agreement, which was admitted into evidence, expressly incorporates the terms of the June agreement. Moreover, Bruce Leben testified at trial about the contents of the June agreement, including the language stating that "the divide box and ditch which feeds it will belong equally to both parties and be jointly maintained."

¶ 57    Given these facts, we perceive no error in the trial court's determination that the Lowes owned half the divider box and that Jerry Lowe did not unreasonably interfere with the Lebens' use of the box when he locked the portion that controlled irrigation of the Lowe ranch.

## E.    Fence

¶ 58    Finally, the Lebens contend that the trial court erred by finding that the Lebens' fence located near the Dry Cedar Creek easement was a trespass on the Lowe ranch and by issuing a mandatory injunction requiring them to remove the fence from the Lowe ranch without adequately identifying the area of encroachment.  The Lowes counter that the trial court correctly found that the fence constituted a trespass on the Lowe ranch and properly ordered that the fence be moved to the Leben ranch.

¶ 59    Based on the current record, we cannot discern from the court's order the location of the trespass that it found.  Accordingly, we reverse the portion of the judgment resolving the trespass claim and remand for additional findings on this issue.

### 1. Standard of Review

¶ 60    We review a trial court's legal conclusions de novo. *Hummel*, ¶ 35. An injunction is an extraordinary and discretionary form of relief designed to prevent future harm. *Trinidad Area Health Ass'n v. Trinidad Ambulance Dist.*, 2024 COA 113, ¶ 35. We review the grant or denial of an injunction for an abuse of discretion. *Id.* "A court abuses its discretion if its decision is manifestly arbitrary, unreasonable, or unfair; is based on an erroneous understanding or application of the law; or misconstrues or misapplies the law." *Id.*

### 2. Analysis

¶ 61    The Lebens first argue that the surveyor should have marked the boundaries of the properties in the area, so the Lebens could identify the location of the alleged trespass and that the failure to do so precluded a trespass finding.

¶ 62    We reject this argument.

¶ 63    Jerry Lowe testified at trial that he had a survey completed during litigation and discovered that the Lebens' fence in the vicinity of the Dry Cedar Creek easement was on the Lowe ranch in some places.

¶ 64    Specifically, Lowe testified as follows:

Q. There was testimony [from the surveyor], and you were here for it, that there is fencing that is encroaching on your property along Dry Cedar Creek. Is that your understanding?

A. Correct. Yes.

Q. And about how much land does that fence you out of?

A. It's about three acres total. It runs about a mile along Dry Cedar Creek.

Q. Okay. And so three acres, over a mile, how many feet are we talking about?

A. It varies from 15 to 20 feet all along the length of that fence

¶ 65    "The elements for the tort of trespass are a physical intrusion upon the property of another without the proper permission from the person legally entitled to possession of that property." *Betterview Invs., LLC v. Pub. Serv. Co. of Colo.*, 198 P.3d 1258, 1262 (Colo. App. 2008) (quoting *Hoery v. United States*, 64 P.3d 214, 217 (Colo. 2003)).

¶ 66    The court heard testimony that the Lebens placed fence posts on the Lowe ranch without the Lowes' permission. The court found the evidence and testimony from the surveyor and Jerry Lowe to be convincing. That evidence supports the court's conclusion that the

fence trespassed on some portions of the Lowe ranch along the southern boundary of the Leben ranch.

¶ 67    The court's judgment required the Lebens to relocate the fence "solely on the Leben property." But it was incumbent upon the court to identify the location of the trespass that it found in a manner that would allow a reasonable person to identify the area of the trespass and the action required to correct the trespass. *See Home Shopping Club, Inc. v. Roberts Broad. Co. of Denv.*, 961 P.2d 558, 563 (Colo. App. 1998) ("An injunction prohibiting conduct must be sufficiently precise to enable the party subject to the equitable decree to conform its conduct to the requirements thereof."). The trial court referred to an excerpt from Exhibit P, which depicted the encroachment of the fence along the Dry Cedar Creek easement. The order stated, "The position of the fence is depicted in [E]xhibit P, above." And the court reproduced in its order a portion of Exhibit P. But the language of the order is not clear whether the area of encroachment encompasses all of Exhibit P, or just the small portion reproduced in the trial court's order. Given these ambiguities, we agree with the Lebens that the injunction order is deficient in two respects. *See id.*

28

¶ 68　　First, we are not sure whether the injunction requires the Lebens to move the fence to the southern boundary of the Lebens' portion of the Dry Cedar Creek easement or the northern boundary of the Lebens portion of the Dry Cedar Creek easement. At first blush, it seems illogical to assume that the court intended the Lebens to move the fence to the southern boundary of the Lebens' portion of the Dry Cedar Creek easement east of the archway, because that would place the fence in the center of the Dry Cedar Creek easement. On the other hand, the centerline of the Dry Creek easement corresponds with the southern boundary of the Leben ranch, so placing the fence there would also arguably be consistent with the court's order. Alternatively, the court may have intended to require the Lebens to move the fence just north of the centerline to the northern boundary of the Dry Cedar Creek easement, which would be within the Leben ranch and outside the Dry Cedar Creek easement.

¶ 69　　Second, we are not sure from the terms of the trial court's order what stretch of the fence needs to be moved. Is it only that portion of the fence depicted on the part of Exhibit P that was reproduced in the trial court's order, which appears to be part but

not all of the encroachment identified in the whole of Exhibit P?  Or did the trial court intend to require the Lebens to move all portions of the fence  encroaching on the Lowe ranch as depicted in the whole of Exhibit P, rather than just the small part reproduced in the court's order?  We are unable to answer these questions based on the terms of the trial court's order and the record.

¶ 70    Given the foregoing, we reverse that portion of the trial court's judgment entering a mandatory injunction requiring the Lebens to move the fence.  On remand, the trial court must clarify what portion of the fence along the southern boundary of the Dry Cedar Creek easement encroaches on the Lowe ranch.  And the court must identify the location where any encroaching portions of the fence must be relocated.  The court, in its discretion, may permit additional evidence and argument on remand to resolve those two issues.  *See Gateway Logistics, Inc. v. Smay*, 2013 CO 25, ¶ 3.

### F.    Costs

¶ 71    The Lebens contend on appeal that they are the prevailing party and therefore entitled to an award of their costs.  However, both parties prevailed on one or more of their appellate contentions.

Under the circumstances, we conclude that neither party is entitled to an award of appellate costs. *See* C.A.R. 39(a)(4).

## IV. Disposition

¶ 72    We affirm the trial court's judgment in part, reverse the judgment in part, and remand for further proceedings consistent with this opinion.

JUDGE FREYRE and JUDGE BROWN concur.